IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL ALUMINUM CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-01314 |
| | ) | |
| v. | ) | |
| | ) | Judge John Z. Lee |
| PEAK CHEMICAL CORPORATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On February 16, 2005, Plaintiff National Aluminum Co., Ltd. ("NALCO") won a final arbitral award ("Arbitral Award") under India's Arbitration and Conciliation Act against Defendant Peak Chemical Corporation, Inc. ("Peak"). After several years of appeals, this award was affirmed by the High Court of Delhi at New Delhi on February 7, 2012 ("High Court Judgment"). NALCO now seeks to enforce the Indian judgment under the Illinois Uniform Foreign-Country Money Judgments Recognition Act, 735 Ill. Comp. Stat. 5/12-661, *et seq*. Noting that the Seventh Circuit has yet to address the issue, Peak contends that NALCO's claim is barred by the three-year statute of limitations set forth in Section 2 of the Federal Arbitration Act ("FAA"). The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because the Court concludes that Section 2 of the FAA does not preempt applicable state law governing the recognition of foreign judgments, even when a judgment is based upon a foreign arbitral award, the Court grants NALCO's motion and denies Peak's motion.

1

**Factual Background**

The facts are largely undisputed. NALCO began this decades-long litigation when it initiated arbitration proceedings in India against Peak on February 7, 1997. Def.'s L.R. 56.1(b)(3)(C) Stmt. ¶ 1. NALCO alleged that Peak breached a contract to supply 35,000 dry metric tons of caustic soda lye to NALCO; the arbitrator agreed. Compl., Ex. A, Arbitral Award, at 18, 40; Pl.'s L.R. 56.1(a)(3) Stmt. ¶ 7.

The Arbitral Award was issued on February 16, 2005, pursuant to India's Arbitration and Conciliation Act. Pl.'s L.R. 56.1(a)(3) Stmt. ¶ 5. It granted NALCO $3,983,120.78 "on account of extra cost incurred by NALCO in procuring the Caustic Soda from Rank Enterprises, Sabic Marketing Limited, and Bali Trading," and $27,107.00 "on account of excess amount paid against supply." Def.'s L.R. 56.1(b)(3) Stmt. ¶ 8. The Arbitral Award also awarded NALCO interest at the rate of ten percent per annum on these amounts "from the date of payment by NALCO to various suppliers covered by risk purchase transactions . . . to the date of recovery of the awarded" and from "June 1994 . . . to the date of recovery of the awarded amount," respectively. *Id.* ¶ 9.[1]

Both Peak and NALCO challenged the Arbitral Award by filing petitions with the High Court of Delhi at New Delhi (the "High Court"). Pl.'s L.R. 56.1(a)(3) Stmt. ¶ 13. Peak petitioned to set aside the award, while NALCO cross-petitioned the arbitrator's denial of other claimed damages. *Id.* While the parties dispute the precise character of the resulting judgment, they agree that the High Court upheld the Arbitral Award on December 4, 2012. *Id.* ¶¶ 17–19. Peak appealed the High Court Judgment, but its appeal was dismissed after it failed to post security in accordance with Indian law. *Id.* ¶ 22. The Indian appellate court expressed

---

[1] NALCO argues that, in the alternative, the Arbitral Award supports interest granted from the date NALCO filed its initial Statement of Claim in India, but Peak disputes this. *Id.* ¶ 11.

frustration in dismissing the appeal, noting that Peak aimed "to leave [NALCO] high and dry without the possibility of recovering any amount under the award." Compl., Ex. C, at 1. NALCO instituted the present action to seek enforcement of the High Court Judgment in Illinois.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must evaluate evidence in the light most favorable to the nonmoving party and may not make credibility determinations or weigh evidence. *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 690–91 (7th Cir. 2010).

Actions to recognize foreign money judgments and questions of preemption are often resolved at the summary judgment stage since legal questions generally predominate. *See*, *e.g.*, *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 481 (7th Cir. 2000) (affirming summary judgment under Illinois Uniform-Money Judgments Recognition Act); *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 711–12 (7th Cir. 2014) (affirming partial summary judgment on preemption issue). The Court addresses issues of foreign law as it would any question of law, except that it "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Twohy v. First Nat. Bank of Chicago*, 758 F.2d 1185, 1193–94 (7th Cir. 1985).

## Analysis

Resolution of this dispute hinges on two questions: (1) whether the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, preempts recognition of the High Court Judgment under Illinois law; and, if not, (2) whether the High Court Judgment is cognizable under Illinois law.

## I. Doctrine of Conflict Preemption

Peak first argues that Chapter 2 of the FAA's three-year statute of limitations on the enforcement of foreign arbitration awards preempts state law recognition of the High Court Judgment. *See* 9 U.S.C. § 207. Chapter 2 of the FAA was enacted to codify the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). *See* 9 U.S.C. §§ 201–08; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). The relevant provision provides that "within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court . . . for an order confirming the award." 9 U.S.C. § 207.

The parties do not dispute that recognition of the Arbitral Award itself is governed by the New York Convention, as enacted through the FAA and Indian law, and is time barred by § 207. *See* Def.'s Mem. at 4. NALCO, however, takes a different tack and argues that, although recognition of the Arbitral Award *per se* may be time barred, the High Court Judgment that affirms the Arbitral Award is enforceable as a matter of Illinois law. Indeed, Illinois' Uniform Foreign-Country Money Judgments Recognition Act allows for the recognition of a foreign-country judgment within 15 years, provided the judgment is still enforceable in its home country. 735 Ill. Comp. Stat. 5/12-669. Thus, so long as the Act's statute of limitations is not preempted by the FAA, this action is timely.

While there is little case law on the issue, the two Courts of Appeals that have addressed the preemptive effect of § 207 conclude that the FAA does not preempt a state's power to recognize a foreign judgment. In the leading case, the Second Circuit held that the FAA limitation "go[es] only to the enforcement of a foreign arbitral award and not to the enforcement of foreign judgments confirming foreign arbitral awards." *Island Territory of Curacao v.*

*Solitron Devices, Inc.*, 489 F.2d 1313, 1319 (2d Cir. 1973). Since its initial *Solitron* decision, the Second Circuit has consistently maintained this approach and has treated foreign judgments enforcing arbitration decisions as being separate and distinct from the underlying arbitral award itself. *See*, *e.g.*, *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 29 F.3d 79, 80–81 (2d Cir. 1994) ("*Seetransport II*") (holding that the New York Convention and FAA Chapter 2 "go only to the enforcement of a foreign arbitral award and not to the enforcement of foreign judgments confirming foreign arbitral awards"). More recently, the D.C. Circuit has adopted this approach, finding that Chapter 2 of the FAA does not preempt state statutes of limitations on the recognition of foreign money judgments. *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 332 (D.C. Cir. 2014).[2]

Despite these rulings, the Seventh Circuit has not addressed this issue directly, and Peak asks the Court to depart from the approach endorsed by the Second Circuit and D.C. Circuit. In so doing, Peak sets forth a number of arguments as to why those decisions are erroneous and enforcement of the Illinois Act would violate the intentions of Congress when enacting the FAA. But the Court is unconvinced that the Seventh Circuit would not follow the approach employed by its sister courts.

"Preemption can take on three different forms: express preemption, field preemption, and conflict preemption." *See Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008). Express preemption exists only when a federal statute "explicitly states that it overrides state or local law." *Id.* Field preemption, meanwhile, occurs when federal law "so thoroughly occupies a legislative field" that there is no room for state law to act. *Id.* (internal quotation

---

[2]  At the time the parties initially briefed their cross-motions for summary judgment, the District Court for the District of Columbia had ruled that § 207 preempted state law; this ruling was subsequently reversed. *Commissions Imp. Exp. S.A. v. Republic of Congo*, 916 F. Supp. 2d 48 (D.D.C. 2013), *rev'd*, 757 F.3d 321 (D.C. Cir. 2014).

marks omitted). Neither express nor field preemption theories apply in this case, and Peak does not otherwise advance that they do. *See* Def.'s Mem. at 8–9. Instead, Peak relies on conflict preemption to assert that NALCO's action is time-barred. *See id.* at 9.

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Thus, in assessing conflict preemption, the Court inquires "whether, under the circumstances of this particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *MITE Corp. v. Dixon*, 633 F.2d 486, 492 (7th Cir. 1980) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). While the analysis is guided by Congressional intent, the Court should consider "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Aux Sable Liquid Prods.*, 526 F.3d at 1034 (internal citation omitted).

Finally, all preemption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal citation omitted). A preemption case "is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Id.* at 575 (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989)).

With these principles in mind, the Court notes that the primary goal of the New York Convention was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced." *Scherk*, 417 U.S. at 520 n.15. Peak attempts to

isolate the second half of this formulation, stressing that the overriding federal interest in uniformity would be undermined by enforcement of the High Court Judgment under Illinois law. Def.'s Mem. at 4–5. In support, Peak cites to *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 579–80 (7th Cir. 2007) and argues that the Seventh Circuit gave uniformity "paramount importance" while considering application of the New York Convention. But this case offers Peak little assistance.[3]

*Argonaut* involved a dispute between two parties regarding the proper interpretation of the arbitration provision contained in their contract. The parties disputed what law should govern the construction of the contractual provision. One side argued that federal common law applied; the other that California law controlled. *Id.* at 573. The Seventh Circuit held that federal common law should be applied when interpreting arbitration provisions, and it was in this context that it noted the "overarching federal concern with the uniformity of international arbitration agreements" and the "important federal interest in consistent and uniform interpretation of agreements governed by the Convention." *Id.* at 579. In short, the *Argonaut* court was concerned about the uniform manner in which arbitration provisions were to be interpreted, as opposed to the recognition and enforcement of foreign judgments that stem from arbitral awards. *Id.*; *see also Commissions*, 757 F.3d at 329 ("uniformity was not Congress's exclusive concern in enacting section 207"). This distinction is significant because, as a general rule, "the recognition of foreign judgments is governed by state law." *Seetransport Wiking*

---

[3] Peak also argues that the Seventh Circuit has indicated that "the procedural provisions of Chapter 2 of the FAA could control . . . even in situations where the claim is not brought under Chapter 2." Def.'s Reply at 4. However, the only basis for this assertion is *dicta* noting that the parties' litigation strategies would be affected by Chapter 2, not that Chapter 2 would have any preemptive or controlling effect on unrelated litigation. *See Lander Co., Inc. v. MMP Invs., Inc.*, 107 F.3d 476, 480 (7th Cir. 1997). Peak also cites a decision of the District of Columbia district court, but that case involved garden-variety enforcement of an arbitral award without an accompanying judgment. *See Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 28, 29 (D.D.C. 1999) (holding that plaintiff could not satisfy judgment against defendant by collecting on a third-party time-barred arbitral award).

*Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 582 (2d Cir. 1993) ("*Seetransport I* ") (citing REST. (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 481 cmt. a (1987)); *see also Soc'y of Lloyd's*, 233 F.3d at 475–77 (relying on Illinois Uniform-Money Judgments Recognition Act to recognize English judgment).

In interpreting § 207, the Court begins with an analysis of the statutory text. *See CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2185 (2014) ("Congressional intent is discerned primarily from the statutory text."). The three-year limitations period in § 207 applies "to any court having jurisdiction under this chapter for an order *confirming the award* as against any other party in the arbitration." 9 U.S.C. § 207 (emphasis added). It continues, "The court shall *confirm the award* unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the Convention." *Id.* (emphasis added). There is no mention in § 207 of an action to enforce a foreign judgment based upon the award. Nor is enforcement of a foreign judgment mentioned elsewhere in Chapter 2. *See Commissions*, 757 F.3d at 327.

Turning to the text of the New York Convention, it is clear that, with respect to the recognition and enforcement of awards, any desire for uniformity makes way for the need to encourage parties to elect international commercial arbitration by facilitating recognition and enforcement of foreign arbitral awards. *See Commissions*, 757 F.3d at 328. It is for this reason that the Convention "expressly preserves, under Article VII, arbitral parties' right to rely upon domestic laws that are *more favorable* to award enforcement." *Id.* (emphasis in original); *see* N.Y. Conv'n Art. VII ("The provisions of the present Convention shall not . . . deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and

to the extent allowed by the law . . . of the country where such award is sought to be relied upon."). This language is at odds with Peak's contention that the concern for uniformity necessitates preemption of the Illinois Act. "The Convention sets a 'floor' but *not* a 'ceiling,' for enforcement of arbitral awards." *Id.* (internal citation omitted) (emphasis in original).

This notion is reinforced by Congress' choice to borrow language from other sections of the FAA when enacting § 207. In particular, § 207 was modeled on § 9 of FAA Chapter 1, a similar provision concerning domestic arbitration (as opposed to international arbitration). *Commissions*, 757 F.3d at 327. Aside from a different limitations period, the language of § 207 closely mirrors that of § 9. *Compare* 9 U.S.C. § 207 ("any party to the arbitration may apply to any court having jurisdiction"), *with* 9 U.S.C. § 9 ("any party to the arbitration may apply to the court so specified"). And courts have consistently found that the statute of limitations in § 9 has no preemptive effect. Thus, the D.C. Circuit's conclusion that Congress likewise intended to create no preemptive effect with § 207 is persuasive. *See Commissions*, 757 F.3d at 327–28.

In response, Peak argues that Chapter 1 of the FAA should have "no bearing on the issues here" because Chapter 1 is focused solely on domestic arbitration. Def.'s Mem. at 21. But this misses the point. When Congress adopts identical language in statutes with similar purposes, courts presume that the language carries the same meaning. *See*, *e.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005).

What is more, the legislative history of Chapter 2 of the FAA is consistent with this textual interpretation. Twelve years passed before the United States signed on to the New York Convention because of a "concern for an unintended effect on domestic laws." *Argonaut*, 500 F.3d at 577. These concerns were articulated when, before enacting the law, the Senate Foreign Relations Committee asked if "this legislation [will] have any effect whatever on state laws?" S.

9

Rep. No. 91-702, at 10 (1970). In response, Richard D. Kearney, the Chairman of the Secretary of State's Advisory Committee on Private International Law, answered that "No . . . it does not." *Id.*

Peak lastly rests on two policy-based arguments to support preemption. First, Peak asserts that recognizing the High Court Judgment affirming the award would constitute an "end run" around the three-year FAA limitations period itself, effectively rendering the FAA period meaningless. Def.'s Mem. at 10–11. But the Seventh Circuit has previously rejected similar "end run" arguments in the preemption context. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012) (rejecting theory that state claims were an "end run" around the lack of a federal cause of action).[4] And even still, the Court does not find that the federal statute would be rendered meaningless in this instance, because parties seeking to enforce a foreign arbitration award still obtain a substantial benefit by seeking recognition of the award directly under the FAA, rather than obtaining a foreign judgment and then proceeding under state law. This is because the FAA has a "generous summary confirmation process" that is balanced by the Act's "relatively demanding statute of limitations." *Commissions*, 757 F.3d at 327. Specifically, Chapter 2 of the FAA, which adopts the New York Convention's procedures for recognition of arbitral awards, allows for confirmation simply on presentation of an arbitration agreement and arbitral award. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards

---

[4] Peak cites a number of cases to support its "end run" theory that longer state limitations periods are "the sort of significant conflict that warrants preemption." Def.'s Mem. at 12. However, these cases involved field preemption, not conflict preemption. *See Oglesby v. RCA Corp.*, 752 F.2d 272, 275–76 (7th Cir. 1985); *Hefferman v. U.S. Virgin Island*, Civ. No. 2009/0087, 2010 WL 4942160, at *5 (D.C. V.I. Nov. 30, 2010); *Zlotnik v. U.S. Bancorp*, No. C 09 3855, 2009 WL 5178030, at *3 (N.D. Cal. Dec. 22, 2009). In field preemption cases, there is legitimate concern that plaintiffs will employ artful pleading to reintroduce state law into a field that is fully occupied by federal law or to subvert federal statutes of limitations. *See Oglesby*, 752 F.2d at 277–78. These concerns are less relevant to conflict preemption analysis. Conflict preemption contemplates that federal and state causes of action may coexist in the same realm unless, of course, state law otherwise frustrates Congressional intent. *See Mite Corp.*, 633 F.2d at 491.

art. 4, June 6, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. In addition, the Convention's procedures permit a considerably narrower set of defenses than those available under state statutes such as the Illinois Act. *See id*. art. 5. All of this is to say that, even with state alternatives available, the FAA statute of limitations retains significant meaning for litigants.

Second, Peak argues that future parties could subvert the limitations period by obtaining a judgment on a "stale" arbitral award in any country with a longer statute of limitations, and subsequently seek enforcement of that judgment in the United States. Def.'s Reply at 4–5. Whatever the merits of this argument, this is not the situation presented to the Court today. The High Court Judgment was based upon a timely, proper appeal of an arbitration decision in the country of its issue and does not implicate the policy concerns raised by Peak. In fact, adopting Peak's approach would raise its own policy concern: refusing to recognize foreign judgments would encourage wasteful duplicative litigation, as parties would seek to enforce arbitral awards in the United States before appeals were finalized abroad in order to avoid running afoul of § 207. In sum, there is nothing to suggest that Congressional intent would be frustrated by enforcement of the Illinois Act. Accordingly, the doctrine of conflict preemption does not apply, and the present action is timely under Illinois law.

## II. Recognition under Illinois Law

Because Illinois law applies, the Court turns its attention to whether the High Court Judgment is cognizable under Illinois' Uniform Foreign-Country Money Judgments Recognition Act. The statutory standard is relatively straightforward. A court must recognize a foreign-country judgment if it "(1) grants or denies recovery of a sum of money; and (2) under the law of the foreign country where rendered it is final, conclusive, and enforceable." 735 Ill. Comp. Stat. 5/12-663(a). The statute also provides exceptions and does not recognize: "(1) a judgment for

taxes; (2) a fine or other penalty; or (3) a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations." 735 Ill. Comp. Stat. 5/12-663(b). Peak contends that the judgment should not be recognized here because it does not award a sum of money, constitutes a penalty, and otherwise violates public policy.

A. **"Sum of Money" Requirement**

For the Court to recognize the High Court Judgment, NALCO must establish that it "grants or denies recovery of a sum of money." 735 Ill. Comp. Stat. 5/12-663(b)(1). NALCO contends that this burden is met, as even Peak admits that the "High Court upheld all of the arbitrator's awards of damages and interests." Def.'s L.R. 56.1(b)(3) Stmt. at ¶ 19. Peak asserts three counterarguments in response.

First, Peak argues that the Court can only recognize a foreign judgment that determines a specific amount of money owed and that does not require further calculations, such as any applicable interest due. *See* Def.'s Mem. 25. According to Peak, such a rule is unique to Illinois and "stricter" than those of other states. *Id.* at 26. However, Peak's argument is based solely on the misapprehension of a single Illinois case, *Bianchi v. Savino Del Bene Intern. Freight Forwarders, Inc.*, 770 N.E.2d 684, 697 (Ill. App. Ct. 2002).

Peak claims that the *Bianchi* court refused to recognize a foreign judgment "because it required calculation to arrive at the final judgment amount." Def.'s Mem. 25. This is plainly incorrect; the court in *Bianchi* refused to recognize the foreign judgment not because it required calculation, but because calculation was simply impossible. The award was contingent on an event that had yet to occur, so the court simply could not determine a monetary value. *See Bianchi* 770 N.E.2d at 694–95 ("Our review of the Italian labor court's order indicates that a specific monetary amount was never determined because it was contingent upon reinstatement,

an event that has not occurred. Moreover, the judgment does not provide any mechanism for Bianchi's reinstatement.").

Furthermore, a reading of the Act dispels any notion that Illinois carries a "stricter" standard than other states. The Act expressly provides that "[i]n applying and construing this uniform Act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." 735 Ill. Comp. St. 5/12-670. The Illinois Act "is a uniform act, not one intended to reflect the idiosyncratic jurisprudence of a particular state." *Soc'y of Lloyd's*, 233 F.3d at 476–77.

Second, Peak argues that since the High Court's decision was styled as a dismissal of an appeal, "[i]t was not an award or judgment for a specific amount of money, nor was it a money judgment itself." Def.'s Mem. 26. As such, Peak contends that the High Court Judgment is not itself "final, conclusive, and enforceable" for the purposes of the Illinois Act, but solely makes the Arbitral Award enforceable "in the same manner as if it were a decree of Court." Def.'s L.R. 56.1(b)(3) Stmt. ¶ 26; *see also* 735 Ill. Comp. Stat. 5/12-663(a)(2). Again, Peak bases this argument on a misreading of *Bianchi*.[5] More instructive authority is *Seetransport II*, where under a similar set of facts, the Second Circuit found a French judgment affirming an arbitral award as "the functional equivalent of a French judgment awarding the sums specified in the award." *Seetransport II*, 29 F.3d at 81–82.

In any event, while styled as a dismissal of an appeal, the High Court Judgment was clearly a decision on the merits. *See generally* Compl., Ex. B, High Court Judgment. The

---

[5] Peak argues that *Bianchi* also stands for the proposition that the money amount must be stated in the text of the judgment and cannot be determined "on the basis of any other documents." Def.'s Mem. at 26 (citing *Bianchi*, 770 N.E.2d at 698). This is also incorrect. *Bianchi* held that the document to be enforced must be a judgment, not that other documents could not be considered to elucidate the meaning of the judgment. *See Bianchi,* 770 N.E.2d at 698.

13

twenty-two page decision analyzes the arbitrator's decision in detail before concluding that the Arbitral Award "is based on a correct appreciation of the facts and the law." *Id.* at 22. The underlying Arbitral Award granted money and interest, with no element of injunctive relief or specific performance, and the High Court Judgment effectively awarded the sums of money specified in that Award.

Third, Peak contends that even if the High Court Judgment is recognized as a judgment for a sum of money, the judgment remains unenforceable, because further fact-finding is necessary to calculate the interest due. Central to this contention, Peak argues that the arbitrator never made a finding as to the dates from which interest was to be calculated, which would leave fact-finding to the present court. Def.'s Mem. 25. Doing so, at least according to Peak, would amount to relitigation of the underlying dispute. *Id.*

But the Arbitral Award itself makes plain that the arbitrator adopted the relevant dates provided in NALCO's submission, which were undisputed at the time. After introducing the parties, the award summarizes NALCO's Statement of Claim, Peak's Reply and Counter-Claims, and NALCO's Reply in great detail. *See* Ex. A to Compl., Arbitral Award, at 1–11. After this summary, the arbitrator delineates fourteen issues, "framed in consultation with the parties," that were disputed and resolved in the arbitration. *Id.* at 11–13. The dates of payments to determine interest are notably absent from this exhaustive list of disputed issues. *Id.* The bulk of the document then examines and makes findings on the fourteen enumerated issues one-by-one and lays out the arbitrator's conclusions. *Id.* at 13–40. And, finally, the arbitrator concludes by specifying the award, noting that interest is to be calculated from "the date of payment by NALCO to various suppliers." *Id.* at 40–41. These dates were not identified among disputed issues, because quite simply they were not disputed.

14

Undeterred, Peak asserts that it would be inappropriate for the Court to consider the precise dates set forth in NALCO's Statement of Claim, because NALCO cannot rely on its pleadings at the summary judgment stage. *See* Def.'s Mem. at 27. This argument lacks merit. First, Peak cannot acquiesce to a material fact in the underlying proceeding, only to claim that the fact now must be relitigated. Moreover, the rule on which Peak relies means only that plaintiffs are no longer afforded the presumption of truth to the factual allegations contained in the pleadings in the instant case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a rule has no bearing here, and certainly does not stand for the proposition that the Court may not refer to the pleadings filed in the arbitration proceedings that underpin the dispute before it, particularly where they were undisputed. *See People v. Wear*, 867 N.E.2d 1027, 1039 (Ill. 2007) (in "interpreting a judgment, [courts] strive to effectuate the trial court's intent [by interpreting] the judgment in the context in which the court rendered it") (citing *Baldi v. Chi. Title & Trust Co.*, 446 N.E.2d 1205, 1208–09 (Ill. 1983).

NALCO's Statement of Claim plainly provide the dates of payment. Decl. of Ciccu Mukhopadhaya, Ex. 1, Statement of Claim, 20–21. Additionally, uncontradicted testimony from the arbitration proceedings indicates that these dates were to be used for the calculation of any interest. Add'l Decl. of Ciccu Mukhopadhaya, Ex. A, Cross-Examination of P.K. Mohapatra, 21. Peak has offered no evidence to counter this assertion or to indicate that these dates were disputed in the underlying case. As such, all that remains is a simple interest calculation, which courts can do when enforcing foreign judgments under Illinois law. *See, e.g., Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 684, 692 (7th Cir. 1987); *Bianchi*, 770 N.E.2d at 695.

### B. "No Penalty" Requirement

Peak also argues that, because of the protracted Indian litigation, the ten percent interest awarded by the arbitrator constitutes an impermissible penalty. If a penalty, the interest portion of the High Court Judgment would be unenforceable under Illinois law. *See* 735 Ill. Comp. Stat. 5/12-663(b)(2). However, Peak's suggestion that an award of interest on compensatory damages would be punitive is untenable. "[T]o award prejudgment interest on the compensatory damage award is to award the full amount of compensatory damages the Court finds the plaintiff entitled to under principles of fairness and equity; it is not to impose an additional penalty." *RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 839 (N.D. Ill. 2008). The Arbitral Award selected an interest rate "in the interest of justice," language that hardly suggests a punitive purpose. Compl., Ex. A, Arbitral Award, at 37. In fact, Indian law allowed for a much higher interest rate of eighteen percent, which the arbitrator discretionarily reduced to ten percent. *See* Def.'s L.R. 56.1(b)(3)(C) Stmt. ¶¶ 10, 29. Thus, there is nothing to suggest that the imposition of interest was punitive.

### C. Due Process and Public Policy

Lastly, Peak argues that, because of prolonged delays, the Indian litigation violated due process and the public policy of the State of Illinois. For a judgment to violate due process under the Illinois Act, the Court must find that "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." 735 Ill. Comp. Stat. 5/12-664(c)(8). Similarly, a public policy defense must establish that recognition "is repugnant to the public policy of this State or of the United States." *Id.* § 5/12-664(c)(3). Peak argues that, since arbitration is meant to provide a speedy alternative to traditional litigation, the

extensive delays in rendering the Arbitral Award violate the purposes behind arbitration. *See* Def.'s Mem. at 29.

While these delays were substantial, it does not follow that they necessarily violated due process or offended public policy, and Peak has failed to cite any authority suggesting the delays here implicate such concerns. Due process in this context simply requires "procedures" that are "fundamentally fair." *Ashenden*, 233 F.3d at 476. Aside from having to accrue further interest,[6] Peak does not contend the process was otherwise inadequate. And, indeed, the weight of authority holds that, without more, even "plainly excessive" or "inordinate" delays do not result in prejudice to a level that would warrant voiding an otherwise valid judgment. *See*, *e.g.*, *Petrilli v. Drechsel*, 94 F.3d 325, 328 (7th Cir. 1996) (finding a thirty-seven month delay did not result in any inherent prejudice); *Keller v. United States*, 38 F.3d 16, 21 (1st Cir. 1994) (noting "[t]here are sound reasons for abjuring a *per se* rule even in cases involving plainly excessive delay" and that an "eight-year delay between trial and judgment" did not violate due process).

As a final note, the Court finds it puzzling that Peak would so vehemently protest a delay that was in large part of its own making. Peak stands on shaky ground when it spends years fighting a judgment, only to then complain that the judgment is "stale" because it took so long to conclude the litigation. The extent of the delay may be regrettable, but the passage of time was a price Peak was willing to pay in the hopes of overturning the judgment. Accordingly, the Court rejects Peak's argument that the delay should render the arbitration award unenforceable.

---

[6] While Peak complains of accruing "millions" in further interest, NALCO notes—and Peak concedes—that this unfavorable result could have been avoided if Peak had deposited with the Delhi High Court the amount owed from the Arbital Award. *See* Pl.'s Reply 18; Def.'s Reply 15 n.4. Having declined that option at the time, Peak's present complaints ring hollow.

## Conclusion

For the reasons provided herein, the court grants NALCO's motion for summary judgment and denies Peak's cross-motion for summary judgment. NALCO is entitled to enforcement of the judgment in the amount of $4,010,227.78, with interest.[7]

**SO ORDERED**                    **ENTER:   9/23/15**

*/s/ John Z. Lee*

**JOHN Z. LEE**
**United States District Judge**

---

[7] As discussed above, interest is to be calculated from the dates laid out in NALCO's Statement of Claim and accepted in the Arbitral Award. NALCO is entitled to the following interest in addition to the base award: ten percent interest on $27,107.00 calculated from June 1994 for "excess amount paid against supply"; ten percent interest on $922,240.00 from a purchase from Rank Enterprises calculated from February 1995; ten percent interest on $1,379,900.00 from a second Rank Enterprises purchase calculated from March 1995; ten percent interest on $1,168,428.00 from a Sabic Marketing purchase calculated from March 1995; and ten percent interest on $472,228 from a Bali Trading purchase calculated from March 1995. Compl., Ex. A, Arbitral Award, 40; Decl. of Ciccu Mukhopadhaya, Ex. 1, Statement of Claim, 20–21. The parties should try to come to an agreement as to the total amount of interest due. If they are unable to do so, the parties should be prepared to present their respective proposals to the Court at the next hearing.